# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| F.A.M.E. LLC d/b/a Falk Associates Management Enterprises a/k/a FAME, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. N22C-12-003 PAW CCLD ) |
| EMTURN LLC AND EVAN TURNER, | ) ) ) |
| Defendants. | ) |

Submitted: January 30, 2025
Decided: April 25, 2025

*Upon Defendants' Motion for Summary Judgment;*
**GRANTED.**

*Upon Plaintiff's Motion for Summary Judgment;*
**DENIED.**

## MEMORANDUM OPINION AND ORDER

Laurence V. Cronin, Esq.; and Kelly A. Green, Esq., of Smith Katzenstein & Jenkins LLP; S. Reid Kahn, Esq.; and Jonathan N. Sabin, Esq., of Kane Kessler, P.C. *Attorneys for Plaintiff.*

S. Mark Hurd, Esq.; and Alexandra M. Cumings, Esq., Morris, Nichols, Arsht & Tunnell LLP; James D. Curphey, Esq.; Jared M. Klaus, Esq.; and Kyle C. Gilliam, Esq., of Porter, Wright, Morris & Arthur LLP. *Attorneys for Defendants.*

**WINSTON, J.**

## I. **<u>INTRODUCTION</u>**

This is a breach of contract dispute between a former professional athlete and his one-time agent. The parties' contracts obligated the athlete to pay a marketing fee on all marketing income received through agent-negotiated endorsement deals. The deal underlying the parties' dispute was an endorsement contract with a shoe company. In addition to cash compensation, the shoe contract awarded the athlete shares of company stock. Five years after the parties terminated their relationship, the athlete began liquidating the company stock. The former agent alleges the athlete's failure to pay a marketing fee on the stock sale income breached the parties' agreements.

After discovery concluded, the athlete moved for summary judgment arguing for resolution of all Counts in his favor. In its opposition brief, the agent moved for partial summary judgment on the breach of contract claims.[1] For the reasons below,

---

[1] *See* Pl.'s Opening Br. in Support of Cross Mot. for Partial Summ. J. and in Opposition to Defs.' Mot. for Summ. J. (hereinafter "PMSJ") at 18-22 (D.I. 165). Defendants argue that the Court should disregard Plaintiff's Cross-Motion for Partial Summary Judgment because it was submitted after the filing deadline. Reply Br. in Further Support of Defs.' Mot. for Summ. J. (hereinafter "DMSJ Reply") at 4 n.1 (D.I. 171). As a general matter, "the Court may award summary judgment in favor of a nonmoving party if it finds that the material facts are undisputed and that the nonmoving party is entitled to judgment as a matter of law." *Liggett Group Inc. v. Affiliated FM Ins. Co.*, 2001 WL 1456774, at *5 (Del. Super. Sept. 12, 2001) (citing *Stroud v. Grace*, 606 A.2d 75 (1992); *Bank of Delaware v. Claymont Fire Co.*, 528 A.2d 1196 (1987)). This is especially true when the issue to be decided on summary judgment is one of contract interpretation, which is "purely a question of law." *Exelon Generation Acquisitions, LLC v. Deere & Company*, 176 A.3d 1262, 1266-

the Court **GRANTS** Defendants' Motion for Summary Judgment, and **DENIES** Plaintiff's Motion for Partial Summary Judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES' RELATIONSHIP BEGINS

In 2010, Defendant Evan Turner was named the College Basketball Player of the Year and declared for the NBA draft.[2] Turner began searching for representation, including meeting with sports agent, David Falk, founder of Plaintiff F.A.M.E. LLC ("FAME").[3] Falk had over 50 years of experience, previously represented Michael Jordan, and in his own words, "is generally considered the most influential player agent in NBA history."[4]

After his initial meeting with Falk, Turner and his mother, who helped with the agent search, expressed concern regarding FAME's fee structure.[5] Specifically,

---

67 (Del. 2017). Plaintiff seeks summary judgment on a contract interpretation issue. *See* PMSJ at 18-22. Accordingly, that Plaintiff filed its brief after the filing deadline does not alter the analysis. *See Reid v. Spazio*, 970 A.2d 176, 180 (Del. 2009) (holding Delaware has "a public policy preference for deciding cases on their merits.").

[2] PMSJ, Ex. 1 (hereinafter "Turner Dep.") 30:10-21.

[3] *Id.* at 30:22-31:4; 37:6-22; First Amended Complaint (hereinafter "Compl.") ¶ 7 (D.I. 21) ("Plaintiff is a sports marketing and management agency that was formed by veteran sports agent, David Falk.").

[4] Compl. ¶ 8; Defs.' Opening Br. in Support of Their Mot. for Summ. J. (hereinafter "DMSJ"), Ex. B (hereinafter "Falk Dep.") 32:18, 255:21-256:1 (D.I. 163).

[5] Turner Dep. 48:1-50:8; DMSJ, Exs. 5-6 (emails from Turner's mother to Turner expressing concern regarding Falk FAME's fees).

3

Turner voiced frustration with Falk's refusal to waive a 4% contract negotiation fee, and FAME's 20% marketing fee.[6] These concerns notwithstanding, the parties continued to negotiate over several phone calls.[7]

Subsequently, Falk and Turner met in-person at FAME's office.[8] At that meeting, Turner agreed to have FAME represent him for the purpose of "talking to teams" in preparation for the NBA draft, until the parties agreed upon an endorsement-contract fee structure.[9] Once Turner agreed to Falk's representation, FAME dropped its request for a 4% fee on Turner's rookie contract.[10] The parties, however, continued to disagree about the marketing fee.[11] FAME contends it sent Turner a draft agreement, which included a blanket 20% marketing fee.[12] Turner denies ever seeing that draft.[13] Regardless, the parties entered into a marketing agreement (the "Oral Agreement"), which lowered FAME's marketing fee to 15%, unless Turner received $2 million in marketing income for any year at which point

---

[6] Turner Dep. 48:1-50:8.

[7] Falk Dep. 170:5-11.

[8] Turner Dep. 67:8-21, 71:18-72:12.

[9] *Id.* at 65:15-23; 67:13-21, 77:21-78:8.

[10] Falk Dep. 185:16-20.

[11] *See* Turner Dep. 113:14-115:4 (discussing how Turner had not yet agreed to have FAME represent him for marketing purposes, because "Falk didn't come back . . . with a compromise or anything" related to marketing fees).

[12] PMSJ, Ex. 9; Falk Dep. 180:16-182:3.

[13] Turner Dep. 100:14-17.

the fee rose to 20% on all marketing income.[14] The Oral Agreement was not reduced to writing, but Turner verbally consented to FAME's representation via a FAME employee ("Cantor").[15] Neither the Oral Agreement, nor the preceding negotiations, discussed stock or how it would be commissioned.[16]

## B.    FAME NEGOTIATES THE ENDORSEMENT DEAL.

Pursuant to the Oral Agreement, FAME began seeking endorsement opportunities on Turner's behalf.[17] This included extensive negotiations between Falk and a Chinese shoe company, Li-Ning.[18] To resolve a dispute regarding the guaranteed minimum compensation, Falk suggested equity as a compromise.[19] Ultimately, Li-Ning offered Turner one million shares of company stock (the

---

[14] PMSJ, Ex. 11 (hereinafter "Oral Agreement").

[15] PMSJ, Ex. 4 (hereinafter "Cantor Dep.") 187:5-17; Falk Dep. 219:3-17, 223:12-22.

[16] Falk Dep. 224:1-14, 228:1-17 (Falk testifying that he "never had a conversation with Evan Turner [regarding] how equity would be commissioned."); *see* Oral Agreement.

[17] Falk Dep. 219:3-17, 225:9-226:6 (discussing Falk's negotiating efforts for Turner).

[18] PMSJ, Ex. 13 (Li-Ning's initial offer regarding Turner); Exs. 14-15 (email communications between Falk and Li-Ning).

[19] Falk Dep. 225:1-5.

"Stock").[20]  Falk accepted Li-Ning's offer on behalf of Turner,[21] and Turner signed the Li-Ning agreement (the "Li-Ning Contract").[22]

Relevant here, the Li-Ning Contract entitled Turner to four types of compensation: (1) guaranteed minimum cash compensation;[23] (2) royalty payments based on the sales of Turner's signature shoe;[24] (3) bonuses based on Turner's on-court performance;[25] and (4) the Stock.[26]  Throughout the Li-Ning Contract's term, FAME sent Defendant EmTurn LLC ("EmTurn"),[27] several invoices for payment of marketing fees related to the first three types of compensation.[28]  All these invoices

---

[20] *See* PMSJ, Ex. 16 (hereinafter "Li-Ning Contract"); PMSJ, Ex. 18 (awarding Turner "1,000,000 of the Company's shares.").

[21] Falk Dep. 43:5-21.

[22] *See* Li-Ning Contract.

[23] *Id.* § 4 (a).

[24] *Id.* § 4 (b).

[25] *Id.* § 4 (c).

[26] *Id.* § 4 (d), schedule C.

[27] EmTurn is a loan out company established by Turner "engaged solely in the business of providing the services of Turner."  Compl. ¶ 10.  Because EmTurn functions as Turner's corporate identity, the Court refers to the two interchangeably.

[28] PMSJ, Exs. 22-23, 25.

were generated after Turner received compensation from Li-Ning.[29]  Turner's financial advisor paid all such invoices with Turner's approval.[30]

## C.    THE WRITTEN AGREEMENT BETWEEN TURNER AND FAME

After Turner signed the Li-Ning Contract, the parties executed a written agreement to memorialize the player-agent relationship (the "Written Agreement," together with the Oral Agreement the "FAME Agreements").[31]  There is no dispute that the Written Agreement was identical in all material aspects to the Oral Agreement.[32]

The Written Agreement provided that for negotiating Turner's "Marketing Contracts, FAME shall receive a Marketing Fee of: []Fifteen Percent [] on all marketing income from leads internally generated by FAME," (the "Marketing

---

[29] PMSJ, Ex. 26 (hereinafter "Vujevich Dep.") 78:17-20; *see* Oral Arg. Hr'g Tr. (hereinafter "MSJ Hr'g Tr.") 36:11-37:4, 43:2-8, Jan. 30, 2025.

[30] *Id.* 37:1-13, 48:13-25, 49:9-14; DMSJ at 1 ("[t]here is no dispute that, under the parties' contract, Turner, through his loan-out company Defendant EmTurn LLC [] paid F.A.M.E. all fees due on money Defendants received from deals F.A.M.E. negotiated.").

[31] PMSJ, Ex. 21 (hereinafter "Written Agreement").

[32] PMSJ at 12; *see* DMSJ at 8 (the Oral Agreement, "which was never signed, is identical in substance to the Written Agreement later signed by EmTurn." (internal quotation omitted)).  *Compare* Oral Agreement, *with* Written Agreement.  Because the Oral Agreement and the Written Agreement are functionally identical, the Court cites to them interchangeably.

Fee").[33]  Falk drafted the Written Agreement and claims he has "written this same agreement, essentially this same agreement, for 50 years with hundreds of players."[34] Over that 50-year career, Falk never received a Marketing Fee on client stock.[35]

**D.  TURNER TERMINATES FAME, WHO THEN SEEKS COMMISSION ON THE STOCK.**

After approximately six years, the parties terminated their relationship.[36]  Up to this point, the parties had not discussed the Stock—which was valued at forty cents per share.[37]  After Turner fired FAME, Falk telephonically advised Turner's financial advisor of Defendants' obligation to pay the Marketing Fee when Turner sold the Stock.[38]  FAME then sent an email to Turner's financial advisor, which read, in part "per your conversation with [Falk] . . . We need to determine when [Turner] will sell these shares and pay [FAME] its 20 percent [Marketing Fee]."[39]  Turner's financial advisor forwarded Turner the email,[40] however, Turner disputes having

---

[33] Written Agreement at 1.  In certain circumstances, FAME's Marketing Fee can be increased to 20%.  *Id.*  While relevant to Plaintiff's recoverable damages should its claims progress, that fact does not impact the resolution of the Motions.

[34] Falk Dep. 123:3-9.

[35] *Id.* 242:18-22.

[36] Turner Dep. 266:1-5, 267:11-268:13; DMSJ, Ex. 3 (letter from Falk to Turner following up on the termination).

[37] DMSJ, Ex. A (hereinafter "Cantor Dep.") 224:7-225:6.

[38] PMSJ at 15 (citing Falk Dep. 66:13-67:9, Cantor Dep. 245:15-22).

[39] Cantor Dep. 224:10-225:22; PMSJ, Ex. 31.

[40] Vujevich Dep. 87:1-89:4.

seen it.[41] Regardless, neither Turner nor his financial advisor ever responded to the email.[42]

Five years later, Defendants ultimately sold over 800,000 shares of Stock.[43] Consequently, FAME invoiced EmTurn for the Stock Marketing Fee, but Defendants never paid.[44] Plaintiff commenced this suit to recover the disputed Marketing Fee.[45]

### E. PROCEDURAL HISTORY

Plaintiff initiated this action in December 2022,[46] and filed the operative Amended Complaint a few months later.[47] FAME originally pled eight causes of action,[48] however, the Court previously dismissed Plaintiff's civil conspiracy and fraudulent conveyance claims.[49] After discovery concluded, Defendants moved for

---

[41] Turner Dep. 277:3-22.

[42] Falk Dep. 266:12-22; Cantor Dep. 237:2-239:2.

[43] PMSJ, Ex. 35 at 25-27.

[44] DMSJ, Exs. R, U-V, Y; Cantor Dep. 154:20-155:8.

[45] *See generally* Compl.

[46] *Id*.

[47] *Id*.

[48] *Id*. ¶¶ 46-101 (asserting claims for "Breach of Oral Agreement . . . Breach of Written Agreement . . . Breach of Implied Covenant of Good Faith and Fair Dealing . . . Tortious Interference with Contract . . . Civil Conspiracy . . . Fraudulent Conveyance . . . Quantum Meruit . . . [and] Unjust Enrichment.").

[49] Defs.' Mot. to Dismiss Am. Compl. Tr., 34:23-35:14, July 12, 2023. While the Court denied Defendants' Motion to Dismiss regarding Plaintiff's implied covenant, quantum meruit, and unjust enrichment counts, it expressed doubt that those claims

summary judgment on all remaining claims.[50]  Plaintiff filed a brief which both opposed Defendants' motion and moved for partial summary judgment on the breach claims.[51]  In that brief, Plaintiff withdrew its claims for breach of the implied covenant and tortious interference."[52]  Accordingly, Counts III and IV are no longer before the Court and not discussed further.  Both parties submitted reply briefs supporting their respective motions.[53]  The Court held oral argument on January 30, 2025.[54]  At the end of oral argument, the Court entered summary judgment in Defendants' favor on Counts VII and VIII.[55]  Hence, only FAME's breach of contract claims remain.

---

would control the parties' dispute. *Id.* 34:2-11 ("breach of the implied covenant . . . I think is very unlikely to become an issue in this case because I suspect that the other considerations will subsume and obviate the need for relying on a covenant[.]"), 35:15-36:11 ("Count Seven is unjust enrichment, Count Eight is quantum meruit . . . I doubt that Counts Seven and Eight are going to come into play[.]").

[50] *See* DMSJ.

[51] *See* PMSJ.

[52] *Id.* at 33 n.15.

[53] *See* DMSJ Reply; Pl.'s Reply Br. in Support of Cross-Mot. for Partial Summ. J. (hereinafter "PMSJ Reply") (D.I. 178).

[54] *See* Judicial Proceeding Worksheet, Jan. 30, 2025 (D.I. 191).

[55] *Id.*  Count VII asserts a "Quantum Meruit" cause of action and Count VIII alleges an "Unjust Enrichment" cause of action. Compl. ¶¶ 92-101.

## III. STANDARD OF REVIEW

The Court grants summary judgment when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[56] The movant bears the burden of establishing the nonexistence of issues of material fact.[57] Upon such a showing, the burden shifts to the nonmovant to demonstrate genuine factual issues exist.[58] In deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmovant.[59]

This well-established standard applies when the parties file cross-motions for summary judgment.[60] Cross-motions for summary judgment are not per se concessions that no material disputes of fact exist.[61] Yet, if no party argues a factual dispute exists, the Court deems the motions to be a stipulation for decision on the merits based upon the record.[62] The existence of a genuine material factual dispute,

---

[56] Del. Super. Ct. Civ. R. 56(c).

[57] *McDonald v. Government Employees Insurance Company*, 2023 WL 7276649, at *1 (Del. Super. Nov. 3, 2023) (citing *Moore v. Sizemore*, 405 A.2d 678, 680 (Del. 1979)).

[58] *Moore*, 405 A.2d at 681.

[59] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992) (citing *Adickes v. S.H. Kress & Co*, 398 U.S. 144, 157 (1970)).

[60] *CM Commercial Realty, Inc. v. Alpha Trust Real Estate, LLC*, 2022 WL 509693, at *3 (Del. Super. Feb. 18, 2022) (citations omitted).

[61] *McDonald*, 2023 WL 7276649, at *1 (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997)).

[62] Del. Super. Ct. Civ. R. 56(h).

however, precludes the Court from resolving a case, even when presented with cross-motions for summary judgment.[63]

## IV.  ANALYSIS

Resolution of the motions on FAME's breach of contract claims–Counts I and II—turns on two questions: (1) whether the Stock is "marketing income" such that it falls within Turner's obligation to pay FAME a Marketing Fee under the FAME Agreements; and (2) whether the statute of limitations bars Plaintiff's breach claims.[64]  The Court addresses each issue in turn.

### A.  THE STOCK IS MARKETING INCOME.

Defendants maintain the term "marketing income" creates ambiguity as to whether the parties intended stock to be commissionable.[65]   Ambiguity notwithstanding, Defendants assert the Court should determine that the Stock is not commissionable, because (1) the undisputed extrinsic evidence shows the parties did not intend a Marketing Fee on stock; and (2) the FAME Agreements must be construed against FAME as the drafter.[66]  To the first point, Defendants note, Falk

---

[63] *United Vanguard*, 693 A.2d at 1079.

[64] DMSJ at 15-28; PMSJ at 18-31.  The parties also dispute whether Plaintiff's recoverable damages for breach of contract "are capped as a matter of law." DMSJ at 28-31; PMSJ at 32 n.14.  The Court, however, need not address the damage cap issue given its ruling on the parties' other arguments below.

[65] DMSJ at 15.

[66] *Id.* at 16-22.

concedes he never had a conversation with Turner regarding how stock would be commissioned.[67]  Thus, Defendants argue FAME's position is its subjective belief that FAME is owed a Marketing Fee; a belief that was never communicated to Turner.[68]  Defendants also question whether FAME's subjective belief was reasonable given that Falk admits he had never, in his 50-year career, received a marketing fee on stock from a FAME client.[69]  Regarding the second point, Defendants contend the Written Agreement's ambiguity means the rule of *contra proferentem* requires that any ambiguity be resolved against FAME.[70]

Plaintiff rejects the contention that the phrase "marketing income" is ambiguous.[71]  First, there is no dispute that: (1) the parties used the terms "compensation" and "marketing income" interchangeably;[72] (2) Turner received the

---

[67] *Id.* at 17 (quoting Falk Dep. 228:5-8).

[68] *Id.* at 18.  Generally, "[t]he unexpressed subjective intention of a party is [] irrelevant," to a contract's interpretation. *Price v. State Farm Mut. Auto. Ins. Co.*, 2013 WL 1213292, at *6 (Del. Super. Mar. 15, 2013).

[69] *Id.* at 17 (citing Falk Dep. 242:18-22).

[70] *Id.* at 18-22.  To support their *contra proferentem* argument, Defendants rely on evidence supposedly showing that Falk considered Turner an unsophisticated businessman, refused to negotiate the FAME Agreements, and any changes to the FAME Agreements during negotiation were entirely driven by Falk.  *See* Falk Dep. 170:5-11, 125:4-21, 128:9-12, 128:20-21.

[71] PMSJ at 18-22.

[72] *Id.* at 20-21 (quoting DMSJ at 25); *see ITT Mfg. Enters., LLC v. Cellco P'ship*, 2011 WL 7121453, at *24 (D. Del. Dec. 29, 2011) (interpreting Delaware law) (holding that where "two terms are used interchangeably . . . the Court will construe them identically.").

Stock as part of his compensation under the Li-Ning Contract;[73] and (3) the Li-Ning Contract was a Marketing Contract, as defined in the Written Agreement.[74] Thus, per FAME, the Stock was marketing income.[75] Second, the phrase "Marketing Fee . . . on all marketing income," invalidates Defendants' position, which attempts to insert a carve-out exempting a specific type of compensation, stock.[76] As a matter of contractual interpretation, Plaintiff's position—the term "marketing income" is not ambiguous and includes the Stock—is correct.

When interpreting an agreement, "the role of a court is to effectuate the parties' intent."[77] Thus, the Court "interpret[s] clear and unambiguous terms according to their ordinary meaning."[78] Extrinsic evidence is not considered unless the Court finds the text ambiguous.[79] A provision is ambiguous if it is fairly

---

[73] *Id.* at 21-22; Li-Ning Contract § 4.

[74] *See* Li-Ning Contract at Preamble (titling the contract "Endorsement Agreement"); PMSJ, Exs. 13-15 (detailing FAME's negotiation of the Li-Ning Contract on Turner's behalf).

[75] *See* PMSJ at 18-22.

[76] *Id.* at 19-20 (internal quotes omitted) (citing *Wilmington Firefighters Ass'n v. City of Wilmington*, 2002 WL 418032, at *7 (Del. Ch. Mar. 12, 2002).

[77] *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006).

[78] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022).

[79] *Id.* (citing *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)).

susceptible to two or more different meanings.[80]  A term is not ambiguous "simply because the parties do not agree upon its proper construction."[81]  Despite Defendants' contention that extrinsic evidence shows Stock is not commissionable, the Court only considers such evidence if the text is ambiguous.  Because the Court finds the text unambiguous, extrinsic evidence will not be considered.

Here, as FAME remarks, the parties use marketing income and compensation interchangeably.  Also, the FAME Agreements require Defendants to pay a Marketing Fee "on all marketing income . . . from any and all Marketing Contracts."[82]  Delaware courts have held "*all* means *all*" when interpreting a contract.[83]  Thus, Defendants' obligation to pay a commission "on *all* marketing income,"[84] applies to any compensation Turner received from any Marketing Contracts.[85]  This includes compensation, which includes Stock, Li-Ning paid to Turner for his marketing of Li-Ning shoes.[86]  While Defendants ask the Court to

---

[80] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[81] *Id.*

[82] Written Agreement at 1.  There is no dispute that the Li-Ning Contract is a Marketing Contract under the FAME Agreements.

[83] *E.g.*, *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1233 (Del. 2018) (emphasis in original).

[84] Written Agreement at 1 (emphasis added).

[85] *Infra*, IV.B. (discussing the meaning of "marketing income.").

[86] Li-Ning Agreement § 4.

exclude the Stock, a "[c]ontract interpretation that adds a limitation not found in the plain language of the contract is untenable."[87]   Similarly, the doctrine of *contra proferentem*, only applies if a contract is ambiguous.[88]   Thus, Defendants' interpretive arguments do not control.  Rather, the unambiguous text of the FAME Agreements establish the Stock was commissionable.

## B.   PLAINTIFF'S BREACH OF CONTRACT CLAIMS ARE TIME-BARRED.

Having found the Stock is marketing income under the FAME Agreements, the Court must address whether FAME's claims are time-barred.  Specifically, the Court must determine when the claims accrued—which hinges on when the Stock first became commissionable.

Defendants argue FAME's right to commission vested when EmTurn received the Stock as compensation for Turner's marketing services.[89]   To support their position, Defendants rely on dictionary definitions of "marketing" and "income."[90]  Specifically, Defendants contend money received from Turner's sale of the Stock

---

[87] *Emmons v. Hartford Underwrites Ins. Co.*, 697 A.2d 742, 746 (Del. 1997).

[88] *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[89] *Id.* at 23.  The Court notes the last of the Stock vested on July 1, 2016.  Cantor Dep. 143:13-144:8; Ex. L, FAME000362.

[90] *Id.* at 24-26.

16

was neither marketing income nor compensation.[91]   Therefore, FAME's right to commission could not have accrued after the Stock sale.[92]

FAME argues the FAME Agreements are ambiguous as to when Stock was marketing income, thus summary judgment on the statute of limitations issue is improper.[93]   At oral argument, FAME's counsel posited that the Stock was commissionable at three separate points in time: (1) when Turner signed the Li-Ning Contract; (2) when the Stock vested; and (3) when Defendants sold the Stock.[94] FAME always invoiced its Marketing Fees when Defendants actually received cash compensation.[95]   Thus, FAME maintains it is reasonable to interpret the FAME Agreements such that the Stock was commissionable at the time of sale, not the vesting date.[96] FAME also notes Falk reminded Defendants that the Stock Marketing Fee was due when Turner sells his shares.[97]   These contentions, however, do not demonstrate a material factual dispute regarding when FAME's breach claims

---

[91] *Id.* at 26.

[92] *Id.*

[93] PMSJ at 29-32.

[94] MSJ Hr'g Tr. 26:4-15, 39:1-19.

[95] Vujevich Dep. 78:17-20; *see* MSJ Hr'g Tr. 36:11-37:4, 43:2-8.

[96] PMSJ at 31.

[97] PMSJ, Ex. 31; *see* PMSJ at 30-31.

accrued.  Rather, the parties' course of dealings demonstrates FAME's right to a Marketing Fee first arose when the Stock vested.[98]

The statute of limitations for a breach of contract claim expires three years after the cause of action accrues.[99]  To determine if a breach of contract claim is time-barred, the Court must answer two questions.  When did the claims accrue?  And, if the claims accrued more than three years before Plaintiff filed its suit, was the statute of limitations tolled at any point?[100]  No party argues the statute of limitations was tolled.  Accordingly, the timeliness dispute depends on when Plaintiff's breach of contract claims accrued.

A claim for breach of contract accrues "at the time the contract is broken, not at the time when actual damage results or is ascertained."[101]  The relevant inquiry is when the plaintiff "could have alleged a prima facie case for breach of contract."[102]

---

[98] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) ("[w]hen construing ambiguous contractual provisions, Delaware courts are permitted to consider the parties' course of dealing.").

[99] *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1275 (Del. 2016); 10 *Del. C.* § 8106.

[100] *Lavender v. Koenig*, 2017 WL 443696, at *3 (Del. Super. Feb. 1, 2017).

[101] *Worrel v. Farmers Bank of the State of Delaware*, 430 A.2d 469, 472 (Del. 1981).

[102] *Vivint Solar, Inc. v. Lundberg*, 2024 WL 2755380, at *27-28 (Del. Ch. May 30, 2024) (quoting *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476, at *12 (Del. Ch. Aug. 22, 2016)), *aff'd* 2025 WL 855020 (Del. Mar. 19, 2025).

The FAME Agreements are silent regarding when Defendants must pay a Marketing Fee.[103] They merely provide, "FAME shall receive a Marketing Fee."[104] Accordingly, the FAME Agreements are ambiguous regarding when payment is due. Ambiguity may be resolved on summary judgment based on extrinsic evidence "whe[re] the moving party's record is not . . . rebutted so as to create issues of material fact."[105] When a contract is ambiguous, "any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."[106]

Here, the parties' course of performance shows Defendants paid commission on the Li-Ning Contract, when Li-Ning compensated Turner.[107] There is no evidence FAME ever objected to this arrangement. Indeed, FAME always sent its Marketing Fee invoice when Turner received compensation from Li-Ning.[108] There is no dispute that Defendants received the Stock at vesting. The parties' course of performance shows that Defendants' obligation to pay the Marketing Fee on the

---

[103] *See generally* Written Agreement.

[104] *Id.*

[105] *GRT, Inc. v. Marathon GFT Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012) (quoting *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232-33 (Del. 2018)),

[106] *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 988 (Del. Ch. 2023) (internal quotes omitted).

[107] Vujevich Dep. 49:9-14, 78:17-20.

[108] *Id.* 78:17-20; *see* MSJ Hr'g Tr. 36:11-37:4, 43:2-8.

Stock, arose when the Stock vested. Thus, FAME had a prima facie case for breach of contract at the Stock's vesting.

FAME's next argument—the Stock was marketing income when Defendants sold the Stock—is not supported by the FAME Agreements' terms. The FAME Agreements require Defendants to pay a commission "on all marketing income."[109] "[M]arketing income" is not defined, so the Court looks to dictionaries to ascertain its meaning.[110] "Income" is generally defined as "money that is earned from doing work."[111] "Marketing" is defined as "a job that involves encouraging people to buy a product or services."[112] Upon vesting, Turner received the Stock as payment for his efforts encouraging people to buy Li-Ning shoes.[113] At that point, the Stock was

---

[109] Written Agreement at 1.

[110] *Lorillard*, 903 A.2d at 738-39 ("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

[111] *Income*, CAMBRIDGE ADVANCED LEARNER'S DICTIONARY & THESAURUS (4th Ed. 2013); *see Income*, MERRIAM-WEBSTER (2024) ("a gain or recurrent benefit usually measured in money that derives from capital of labor."); *Income*, DICTIONARY.COM (2024) ("revenue received for goods or services, or . . . the money, or amount of money, received from one's employment."). "Compensation," which the parties agree was used interchangeably with the term "income," has a similar definition. *E.g.*, *Compensation*, CAMBRIDGE ADVANCED LEARNER'S DICTIONARY & THESAURUS (4th Ed. 2013) ("the combination of money and other benefits (reward) that an employee receives for doing their job.").

[112] *E.g.*, *Marketing*, CAMBRIDGE ADVANCED LEARNER'S DICTIONARY & THESAURUS (4th Ed. 2013).

[113] *See* Li-Ning Contract § 4.

marketing income and FAME could invoice a Marketing Fee.[114] Conversely, the money Turner received from the Stock sale was not due to any marketing efforts. While FAME invoiced the Stock Marketing Fee after Defendants began selling shares, that fact alone does not alter the analysis. FAME's choice to invoice the Stock Marketing Fee at the time of sale was inconsistent with its past practice. Moreover, a party intentionally sitting on its contractual rights does not toll the statute of limitations.[115]

Therefore, FAME's argument that the Stock was commissionable at the time of sale, impermissibly excludes the term "marketing" from the FAME

[114] Indeed, as discussed above, the parties' past-performance indicates this is when FAME would have typically invoiced a Stock Marketing Fee. Plaintiff's contention that the Stock was commissionable when Turner signed the Li-Ning Contract, fails for the same reason, and is inconsistent with the definition of "marketing income." *See* OA Tr. 36:11-37:4, 43:2-8. When Turner signed the Li-Ning Contract, he had not yet taken any action to encourage the public to buy Li-Ning shoes. *See* Li-Ning Contract Preamble (noting Turner signed the Li-Ning Contract on August 23, 2010), § 2 (providing the Li-Ning Contract's term began August 31, 2010), §§ 3, 6, 7 (requiring Turner to take certain marketing actions during the Li-Ning Contract's term).

[115] *See Chaplake Holdings, LTD. v. Chrysler Corp.*, 766 A.2d 1, 6 (Del. 2001) ("[s]tatutes of limitation prevent a party from sleeping on assertable rights to the disadvantage of a defendant."); *Husband (G.T.B.) v. Wife (G. R.)*, 424 A.2d 12, 14 (Del. 1980) (citations omitted) ("[s]tatutes of [l]imitation are intended to exact diligence in the prosecution of litigants' claims."); *Wilson v. King*, 673 A.2d 1228, 1233 (Del. Super. 1996) ("[s]tatutes of limitations are enacted to require plaintiffs to use diligence in bringing suits so that defendants are not prejudiced by undue delay. I find in this case that to permit the complaint to be filed does not contravene the public policy underlying the statute because plaintiff acted diligently[.]").

Agreements.[116]  Accordingly, both extrinsic evidence and the FAME Agreements' text confirms FAME's breach of contract claims accrued when the Stock vested on July 1, 2016.[117]  FAME filed this action in December 2022, long after the three-year statute of limitations expired.  Therefore, Counts I and II are time-barred.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Partial Summary Judgment.


**IT IS SO ORDERED.**


/s/ Patricia A. Winston

**Patricia A. Winston, Judge**

---

[116] *Lennox Industries, Inc. v. Alliance Compressors LLC*, 2021 WL 4958254, at *5 (Del. Super. Oct. 25, 2021) ("Delaware courts avoid reading contracts in a way that would render provisions illusory or meaningless or that would read language out of the agreement." (citing *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 287 (Del. 2001); *Seabreak Homeowners Ass'n v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986))).

[117] Cantor Dep. 143:13-144:8; Ex. L, FAME000362.